**IN THE COURT OF APPEALS OF IOWA**

No. 24-0071
Filed April 24, 2024

**IN THE INTEREST OF S.S., R.S., and S.S.,**
**Minor Children,**

**S.S., Father,**
        Appellant,

**J.C., Mother,**
        Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, Linda M. Fangman, Judge.

Parents separately appeal the termination of their parental rights.

**AFFIRMED ON BOTH APPEALS.**

Andrew C. Abbott of Abbott Law Office, P.C., Waterloo, for appellant father.

Joseph G. Martin, Cedar Falls, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Tammy L. Banning of Juvenile Public Defender Office, Waterloo, attorney and guardian ad litem for minor children.

Considered by Tabor, P.J., and Badding and Buller, JJ.

**BADDING, Judge.**

The mother of the three children at the center of this termination appeal, born in 2016, 2019, and 2022, was described throughout the proceedings as "hostile," "threatening," "aggressive," and "belligerent." The father was mostly absent. The juvenile court terminated their parental rights under Iowa Code section 232.116(1)(e), (f), and (h) (2023). On appeal, the father purports to challenge the sufficiency of the evidence supporting those grounds. The mother claims the court "should have found that the children could be safely reunified with [her] or, in the alternative, that continued deferral of permanency would be appropriate to allow [her] to continue to work toward reunification." Upon our de novo review of the record,[1] we affirm.

Starting with the father's appeal, while the sole issue heading in his petition on appeal contests the grounds for termination, he only argues the children could have been returned to the mother if she was given more time. That is not a challenge to any of the grounds for termination as they relate to the father. *See In re D.G.*, 704 N.W.2d 454, 459 (Iowa Ct. App. 2005) ("[I]n termination of parental rights proceedings each parent's parental rights are separate adjudications, both factually and legally."). And the father lacks standing to challenge termination of the mother's parental rights or make arguments on her behalf. *See, e.g., In re*

---

[1] We review termination proceedings de novo. *See In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). "The burden is on the State to show by clear and convincing evidence that the requirements for termination have been satisfied." *Id.* Although we normally apply a three-step analysis in conducting our review, we only address the steps raised by the parents on appeal. *See id.* If those steps support termination, we consider any ancillary issues raised by the parents.

*J.H.*, 952 N.W.2d 157, 171 (Iowa 2020); *In re K.R.*, 737 N.W.2d 321, 323 (Iowa Ct. App. 2007).  So we do not consider his claim further.

Moving on to the mother's appeal, we interpret the reunification component of her argument as a claim that the children could have been returned to her custody at the time of the termination hearing.  But that argument only implicates termination under section 232.116(1)(f) and (h), not section 232.116(1)(e).  We could summarily affirm on this unchallenged ground.  *See, e.g.*, *In re Q.B.*, No. 23-2112, 2024 WL 707194, at *1 (Iowa Ct. App. Feb. 21, 2024) (affirming termination under paragraph (e) as an unchallenged ground because mother's claim that child could be returned to her custody did not implicate that ground for termination).

Still, we choose to address termination under paragraphs (f) and (h).  In arguing that reunification could have occurred at the termination hearing, as required by the fourth element of those paragraphs, the mother claims she "reengaged in some amount of mental health counseling," she "had completed a series of independent [urinalysis tests] to show sobriety," and "there were not ongoing concerns of domestic violence . . . as the father was incarcerated and there was a no-contact order preventing him from being in the presence of the children."  *See* Iowa Code § 232.116(1)(f)(4), (h)(4); *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting "present time" to mean "the time of the termination hearing").  This is a rose-colored view of the facts, to say the least.

The Iowa Department of Health and Human Services first became involved with the family in May 2020 after the father assaulted the mother in front of the two oldest children.  While being treated at the hospital for her injuries, the mother

tested positive for amphetamines, and she admitted to recent methamphetamine use. The father was arrested and charged with multiple crimes for the assault. A no-contact order was entered in June (even though one was already in effect at the time of the assault) prohibiting the father from having contact with the mother or the children. The two children were later removed from the mother's custody and adjudicated in need of assistance. They were eventually returned to the mother's custody, and the case closed in April 2022.

Just three months later, the department learned the mother tested positive for methamphetamine at a doctor's appointment. She was twenty-seven weeks pregnant with her third child with the father.[2] The department launched an investigation and found the father in the family home. He was arrested for violating the no-contact order still in effect. The mother agreed to allow the maternal grandmother, who lived in Arkansas, to care for the children. A few weeks later, the mother assaulted the grandmother and fled with the children. They were found at a motel in Iowa in early September. The two children were removed from the mother's custody, and one of them tested positive for methamphetamine. They were adjudicated in need of assistance later that month.

The mother entered inpatient treatment for her substance use in late September. She tested positive for methamphetamine at admission. The youngest child was born a few weeks later. The State filed a child-in-need-of-assistance petition for him in October, although he was allowed to stay with the

---

[2] Besides the three children at issue here, the mother has five older children with other men. Her parental rights to three of those children were terminated, two in New York and one in Arkansas. She gave a fourth child up for adoption at birth. And a fifth child is in the full custody of that child's father in another state.

mother at her treatment facility. But after the mother failed to take the infant for medical appointments that were required because of his low weight, the State obtained an order for his temporary removal. The mother was arrested on a warrant later that month. The youngest child was adjudicated in need of assistance in November. Once she was released from jail, the mother returned to inpatient treatment. But she left in January 2023 after instigating a fight with other residents. It has been a downward spiral for the mother since then.

The mother was homeless and unemployed for several months, bouncing "all over the place," from Charles City, to Waterloo, to Fort Dodge. With the department's help, she eventually obtained housing. But she has never held a job. The mother's participation in substance-use treatment was sporadic, and she no-showed for almost every drug test the department requested. The mother finally started some mental-health counseling in May, after her in-person visits with the children were suspended because of her behavior.[3] Even though the counseling appointments were virtual, the mother's attendance was inconsistent. And her mental health was deteriorating.

Starting in late July, the mother posted a series of homicidal and suicidal messages on social media. She also sent providers threatening text messages. Because of her threats, the department assigned two case managers to the family.

---

[3] At an April visit, the mother threatened to kill herself in front of the children, which caused the older two "to be very emotionally disturbed, upset, and distraught." During some earlier visits, she told the children things like the department was "mean to her," they have "to be good" or they would "never come home," and "she does not do drugs and that [the department] is lying." The children had severe behavioral issues after these visits, including hitting other children and threatening to harm themselves. Those issues resolved after in-person visits stopped.

As the juvenile court observed in a permanency order that month, the mother could not "control her anger long enough to sit through a court hearing"—"she became agitated and was talking over people, used vulgar language, and was derogatory" to the court "and everyone participating in the case." The mother was unable to resume in-person visits with the children, though she did have virtual interactions with them. Yet even those were problematic. The State petitioned to terminate the parents' rights in September. At the hearing in December, which the mother did not attend, a case manager testified the children could not be returned to the mother—then or within a reasonable time. She pointed to long-standing and unresolved concerns with the mother's substance use, mental health, continued relationship with the father, and inappropriate behavior. Put simply, the case was plagued by the mother's belligerent hostility toward the professionals trying to help her reunite with her children and her clearly unstable mental health.

Against this backdrop, the mother's engagement in "some amount of mental health counseling" was not sufficient to allow a return of custody. *See In re D.H.*, No. 18-1552, 2019 WL 156668, at *2 (Iowa Ct. App. Jan. 9, 2019) (concluding a mother's "failure to seek treatment for her mental-health conditions supports termination of her parental rights"). As for the mother's sobriety, she tested positive for methamphetamine multiple times early in the proceedings. Then she refused drug testing through the department altogether. *See In re C.A.*, No. 23-0746, 2023 WL 5092843, at *2 (Iowa Ct. App. Aug. 9, 2023) (presuming a parent's "numerous no-shows for testing would have returned positive results"). Like the juvenile court, we put "no faith" in the at-home drug tests the mother started taking before the termination hearing. On this record, we can only conclude

that the mother remains in the throes of addiction, just as she remains enmeshed in her relationship with the father. They continued to have contact with one another despite multiple no-contact orders, criminal consequences, and juvenile court involvement. With this unfiltered view of the facts, we agree with the court that the children couldn't be returned to the mother's custody at the termination hearing. *See In re T.S.*, 868 N.W.2d 425, 435 (Iowa Ct. App. 2015) (citing mother's methamphetamine abuse and violent relationship as reasons that returning child to her custody would be contrary to his welfare).

Turning to the second part of the mother's argument, she has failed to enumerate any "specific factors, conditions, or expected behavioral changes" that would warrant an extension on her behalf. *See* Iowa Code § 232.104(2)(b). It's not our role to do so for her. *See In re A.H.*, No. 20-1660, 2021 WL 1399743, at *4 (Iowa Ct. App. Apr. 14, 2021); *accord Inghram v. Dairyland Mut. Ins. Co.*, 215 N.W.2d 239, 240 (Iowa 1974). In any event, looking at the mother's past performance—which includes years of services and a failed reunification—"we are not convinced additional time or services will change" her. *See In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990). So we conclude additional time is unwarranted, and we affirm the termination of the mother's parental rights.[4]

**AFFIRMED ON BOTH APPEALS.**

---

[4] In passing, the mother also complains that the children "were not all placed together" in one concurrent home at the time of termination. While there is "a preference to keep siblings together," the "preference is not absolute" and must give way to the children's best interests. *In re J.E.*, 723 N.W.2d 793, 800 (Iowa 2006). Although the oldest child is in a separate home from his two siblings, all three are thriving. They are bonded with their foster families, who facilitate contact between the siblings, and the oldest two want to stay where they're at. We conclude maintaining these stable placements is in the children's best interests.